May it please the Court, Arthur Caderall of the Justice Department, on behalf of the Commissioner, and I'd like to reserve five minutes for rebuttal, if that's all right. The 2003 amendments to the regulations under IRC Section 482 codified two positions the IRS had taken under the then-existing cost-sharing regulation. First, that the term cost includes the cost of stock-based compensation, and second, that a qualified cost-sharing arrangement between related parties achieves an arm's-length result only if the parties agree to share all development-related costs in proportion to their anticipated benefits from the arrangement. Taken together, these amendments had the effect of requiring related participants in a qualified cost-sharing arrangement to include the cost of stock-based compensation in the cost-sharing pool in order for the arrangement to occur. Is it your position that you are permitted by the statutes to do away with the comparability analysis for all of these cost-sharing arrangements, regardless of whether they have to do with intangible property? I think by definition, these cost-sharing arrangements involve intangible property. So are you saying that you now interpret the statute differently than Treasury once interpreted the statute, that, in other words, there is no obligation to look only at arm's-length transactions? Well, I think since 1986, I mean, that's when the language of the statute changed, and by its terms, the commensurate with income requirement requires you to compare the two sides of the related party transaction as opposed to comparing it with an uncontrolled transaction. So since 1986, we believe that this commensurate with income requirement has, you know, permits the position that Treasury is taking now. And do you think the statute unambiguously permits that position? I think both parties agree that the statute is ambiguous. You know, it doesn't even say the words arm's-length standard. Now, we concede that the arm's-length standard is implicit in that first sentence, but I believe both parties agree that the statutory language itself is ambiguous. So is it that you think that the ambiguity is what the second sentence means? I think there's certainly some ambiguity as to how the, you know, how do you harmonize the second sentence with the arm's-length standard that is implicit in that first sentence? So that's why, you know, we go to Chevron step two. Now, in the tax court's view, the effect of this regulation of these amendments presupposes an empirical determination on Treasury's part that unrelated participants in similar types of arrangements would agree to include the cost of stock-based compensation in the cost-sharing pool. Now, how did the tax court reach that conclusion? It relied on its holding in Xilinx that under the pre-amendment regulatory scheme, application of the arm's-length standard always required an analysis of what unrelated entities do under comparable circumstances. It's been kind of hard to follow the moving target that's somewhat been your argument. I mean, it appeared that in the beginning you tried to argue that, well, we did do an It begins to feel like what you're saying is that we really don't have to do an empirical analysis because it's a policy-based evaluation of what the statute allows us to do. I don't believe we ever said we did an empirical analysis. I mean, Treasury from the start didn't think it had to do an empirical analysis, and, you know, the tax court's decision was so easy for them to make because they started off on the wrong foot with this, you know, this empirically-based state farm analysis. But again, the error that the tax court made is that it failed to recognize that the very amendments it was evaluating rendered its understanding of the arm's-length standard in Xilinx untenable. And that's the question, or that's what the court should have examined, is whether Treasury could alter the legal landscape in that manner. Because if Treasury could do that, then it necessarily follows that the court's empirically-based state farm analysis is in a posit. So let's turn to the Xilinx case. The issue in Xilinx was whether the IRS's interpretation of its cost-sharing regulation as requiring participants to share all costs without regard to evidence of whether unrelated parties would agree to share a particular cost could be reconciled with the more general regulatory provisions describing the contours of the arm's-length standard. Those regulations then and now describe the arm's-length standard as follows. A controlled transaction meets the arm's-length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances. That's in dash one of their regs. And that provision goes on to state that whether a transaction produces an arm's-length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. The tax court in Xilinx, seeing nothing in the regulations expressly stating that Treasury could prescribe an arm's-length result without reference to what unrelated parties do, simply declined to infer such authority from the language providing that the arm's-length result is generally determined through comparability analysis. Yeah, well, this court went a little bit farther, didn't it? It said you've got two different pieces of the regulation and one says do a comparability analysis and the other says you don't have to and that was unambiguously confusing and then the court had to choose which one it thought the regulation really required. And it said the first is what's consistent with established practice and it also said a few things like what's consistent with the purposes of the statute and with our treaty obligations, right? Right. So given that the court said that, why isn't the decision here controlled by Xilinx? Because Treasury changed the regulations that were at issue in Xilinx and the real issue should be was Treasury authorized to do that? Well, the statute is the same both as of the Xilinx case and as of now, correct? Right. And what Treasury did is it amended the regulations to make explicit what it had argued was implicit in those regulations that were at issue in Xilinx. You know, the tax court said we think these, the tax court in Xilinx said we think dash one and dash seven can't be reconciled, but Treasury is always free to modify their regulations to... Well, it said a little more than that. The majority said that it was an open question whether the new regulations would remedy that flaw. And that's the question... They were unable to choose between the two regulations. And they said that there were new regulations that attempted to answer that question. And that's the question that the tax court... Did the new regulations remedy that flaw? Right. And the tax court just didn't address that question. The open question that Judge Fisher referred to in his concurring opinion. Do you think that the commissioner had the authority to interpret 482 to eliminate the arm's length standard? I mean, you talked earlier about it being implicit, but it's not in the statute. The statute is income focused. Right. And Treasury had historically interpreted that statute as requiring an arm's length analysis. But do you think that given the words of the statute that the commissioner had the authority to eliminate the arm's length portion of that? I do not think so, no. And part of that, granted, there's nothing in the statute. The arm's length standard is not even mentioned in the statute. But you have to look at the history going back decades. Plus, the arm's length standard, whatever it means, is in all of our tax treaties. And there's just too much history. So given that, then what was the permissible limit of limiting the arm's length standard for the commissioner? Well, I think one limit is in the second sentence that was added to Section 482 in 1986, this commensurate with income requirement, it only applies in the context of intangibles. So, you know, that's certainly one limiting factor. But it also says only in connection with transfer or licensing. I mean, how is that the same as a cost-sharing arrangement for the development of intellectual property as opposed to a cost-sharing arrangement for the transfer or licensing that the phrase is expressly used in the statute? Well, I mean, we don't think there's anything in Section 42 that would preclude a broad interpretation of the word transfer that would include the relinquishment of future exploitation rights pursuant to a cost-sharing agreement. That's how the tax court interpreted the word transfer in the Xilinx case. And this court on appeal in Xilinx did not even mention this transfer issue in either of its opinions, even though the parties had briefed it. But even if the word transfer were deemed not to encompass cost-sharing arrangements, there's nothing in Section 482 that would compel an interpretation of the commensurate with income requirement as precluding Treasury from extending its application to cost-sharing arrangements. But wouldn't your argument taken to its logical extreme do exactly what you just told Judge Thomas you can't do, which is it would say that you could effectively do away with the arm's-length standard because you could just say you're using the commensurate with income standard in all circumstances? No, because, again, the issue is what does the arm's-length standard mean? And the arm's-length standard is separate and distinct from comparability analysis, which is sort of a means to an end. So we don't think... Okay. So you think you could do away with all comparability analysis? No, no, certainly not. And particularly, you know... When you say no, no, certainly not, are you referring specifically to the patents or the licenses or the limited category in that second sentence of the statute? Right. With respect solely to that, are you saying that you do away with the comparability standard? No, I don't think... Would you ever, in making a determination of the property described in the second sentence of the statute, would you ever look to actual contracts between non-related parties? Sure, sure. And the regulations reflect that. I mean, you know, regulations other than in the cost-sharing context. There's... Yeah, comparability analysis is alive and well. With respect to those specific categories, those specific types of agreements described in the second sentence? Yes, and the regulations bear that out. And... If you had a circumstance which would be very unusual, where you actually had a cost-sharing arrangement of this type between unrelated parties, would you look to that in the first instance or not? No, no. Your argument is that when there's a cost-sharing arrangement, you look solely at the second sentence and do the kind of analysis that you did in this case. Right, and we get that from the 1986 conference report, which specifically says, you know, we are aware of cost-sharing arrangements and we think that's a permissible way to divide the income, you know, provided that any such arrangement has to reflect the purpose of this amendment and, you know, reflect the actual economic activity of each party. If you got received evidence of non-related parties entering into contracts, cost-sharing contracts, you would then look at them and see why? No, not in the cost-sharing context. The regulation sets forth a specific rule that says, you know, a qualified cost-sharing arrangement will achieve an arm's-length result if and only if it complies with these basic economic terms where the parties agree to share all development-related costs in proportion to their anticipating. So you never have to do a comparability analysis again for these qualified cost-sharing arrangements? That is correct. Now, if that's the case, given what we defined the Treasury policy to be as of Xilinx, or what this Court defined it to be as of Xilinx, why isn't that a change in policy under Fox Television that requires us to carefully analyze the way in which you implemented that change in policy? Well, because the IRS had taken the position since at least as far back as 1997 that in the cost-sharing context, you know, all costs means all costs. And that's what the 1986 conference report said. And that's what we're following. And the fact that you can come up with evidence that shows that unrelated parties in similar types of arrangements would not agree to share the cost is irrelevant in this context. Okay. So arm's-length and comparability don't go hand in hand? Correct. That's yes. They do not. I mean, there is certainly, you know, comparability analysis is a very important means to the end of getting to an arm's-length result. But they are not, they do not go hand in hand. I mean, you can have... You're arguing they're not synonymous. Exactly. And I think... You're saying you only use comparability of outside contracts if they follow the standard in the second sentence and are based on the economic realities and the profit sharing. Okay. In the second sentence of the statute, that you only use comparability for an agreement, non-related party agreement. If it follows the economic realities set forth in the second sentence. Right. But again... Then in that type of agreement, you would follow the comparability standard. But there aren't such agreements. Well, the only narrow context where comparability analysis doesn't play a role is in cost-sharing agreements. Well, what I thought your answer was, perhaps to Judge Renner's question, is that you decided as a matter of policy that these transactions are not comparable and therefore you're not going to do a comparability analysis in the cost-sharing. They're inherently not comparable. I mean, that's your argument. Absolutely. But the entirety of 482 applies to cost-sharing arrangements, correct? Sure. And it's just, you know, it's just how do you harmonize the commensurate with income requirement with the arms link standard? And, you know, we think you look to... There's no better guidance than that 1986 conference report that says, you know, you can go ahead and keep doing these cost-sharing arrangements if and only if they meet, you know, they follow the purpose of this legislation. And then the report goes on to say what that means. And that's, you know, that's exactly... If that's the case, why didn't Congress want to amend 482 just simply use the second sentence and not even bother with the first sentence? Well... If it was legislated against the backdrop of knowing that comparability analysis had always been used. That's a good question. And I would venture to guess that Congress has to choose its words very carefully in this context, precisely because we have all these international tax treaties that are rooted in the arms link standard. So Congress, you know, is not going to just abandon the arms link standard. And so, you know, I think that's why you don't have a clearer statement is because they didn't want to scare off all of our treaty partners who might think that, hey, everything we've thought was gospel for all these years is out the window, which is not the case. But I think that's why Congress... How about political timidity? Would that be... Your words, not mine. But I mean, on one hand, the argument is you're saying, of course, that comparability is not synonymous with arm's length. But doesn't your argument then depend in this context on saying that this commensurate with income test is... can be synonymous with arm's length? Yes, yes. And I think we... They're kind of different concepts. I mean, they are. And that's the troubling part of this case is that you don't... Your analysis you're doing under the commensurate with income test, and you do another context is not the same thing as a classic comparability analysis. And I think the way we explained it in our brief is that, in essence, Congress enacted a presumption that when you're dealing with transfer or license of intangible property, that the presumption is if an alleged comparable transaction does not produce a result that is consistent with the commensurate with income requirement, then it's not comparable. So, and the legislative history goes in depth about the lack of reliability of allegedly comparable transactions in this area. And so I think this commensurate with income requirement is basically a check in this area of intangibles. And I think Congress's thought was that there was... The courts were placing too much reliance on allegedly comparable transactions that were, in fact, not comparable. Thank you, counsel. We'll give you five minutes to rebuttal and put 25 minutes on the clock, so we'll equalize the time. Thank you, Your Honor. Dallin Falk for Altera. I may please the court. The 15 specialist judges of the tax court were right to reject the notion that you could take an administrative record that said that arms-length parties would never share stock-based compensation and somehow magically turn that into a rule that says they always have to share it because in enforcing a statute, and a statute that was not changed by the 1986 amendment, that implicitly incorporates the arms-length standard to achieve the purpose, a little close, sorry about that, to achieve the statutory purpose recognized by the Supreme Court and still recognized by the Treasury's regulations, that the purpose is to achieve parity between controlled and uncontrolled parties. Now, the new position seems to be... Not a position that's anywhere in the preamble. The new position seems to be that the addition of commensurate with income has completely wiped away the arms-length standard, not apparently as applied to the transactions actually covered by the text of that amendment, which are transfers, as Judge O'Malley pointed out, but transactions that aren't even covered by the text but seem to be addressed by the legislative history on those and those apparently alone, though I don't see how their logic would be limited there. Commensurate with income wiped out the arms-length standard and took all the arms-length elements out of it. I mean, you can talk about doing an arms-length analysis without comparables, but if you're looking at what arms-length parties do or would do and you're not looking at what they actually do, it's not arms-length anymore. It's just words on a piece of paper. Can I get a few things out of the way so I know exactly what your position is? Now, do you agree that the statute is ambiguous as to whether or not 482 requires a comparability analysis? No, I don't think it's ambiguous. It's ambiguous in the sense that it is not there on the face of the text, Your Honor, but it has been recognized and has been conceded right here in this courtroom that the arms-length standard is implicitly incorporated into, it is what it means to place controlled and uncontrolled parties on parity. I think that it unambiguously requires a comparability analysis. I think it is unreasonable to say that it does, that it requires anything else. No, I understand there's a difference. An important distinction under Chevron. Well, there is, there is, there is, but the result comes out the same place, Your Honor. I mean, I can't say the text says that, but I can say that the text has been consistently understood to mean that. And so I think, I think to look at it and to say that clear reflection of income between, for an uncontrolled, I'm sorry, a controlled party is reflected by anything other than uncontrolled party practice is something that is outside the statute. So I think logically, yes, it is included in that. But I don't think the statute is ambiguous, at least with respect to what Congress intended by the amendment in 1986. Well, I don't think it's that ambiguous, Your Honor. And I don't think it, what was intended, I think, was what Congress said was that, and what it said in legislative history and the plain meaning of the statute, which is that you essentially have a look-back and you can make the arrangement between parties commensurate with income, which requires knowing what the income is in the future. And that's what the legislative history said. They said the problem is people were getting by with comparable transactions that were not really the same type of transaction and that undervalued the intellectual property and provided for no periodic adjustments. Now, of course, some licenses, as Your Honor knows quite well, do provide for periodic adjustments. It's not super common, but it is certainly out there. And that's what Congress was looking at. That's what commensurate with income means, that you come back and you look and make an adjustment based on what the reasonably anticipated benefits, what an arm's-length party would have done had they known how profitable this was going to be. And that's what the regulation said. Do you agree that to the extent we found any ambiguity in what Congress intended by that amendment, that the Treasury would have the authority to regulate, to fill that gap or to resolve that ambiguity? Only if it's reasonable, Your Honor. And I don't think it's reasonable to wipe away the arm's-length provision for a number of reasons. Among them is that the Treasury has said all along the general goal of the commensurate with income standard is, as is in the White Paper, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's-length transfer of the intangible. And more pointedly, Your Honor — But doesn't that go backwards, too? If we're talking about parity, we're talking about parity in terms of income analysis under the statute, right? So, I mean, part of the statute, it goes the other way. You want to avoid double taxation on one hand. On the other hand, of the unrelated parties, it may be that the only way to get parity is by allocating these costs, right? Well, you allocate them the way unrelated parties would allocate them. That's the only benchmark that Congress provided. Commensurate with income, indeed, the very regulations that tell you how to allocate, which would be the Dash 4 — But that would seemingly give — put the parties not in parity because it gives the tax advantage and, therefore, the income advantage to the related parties versus the unrelated parties. Well, I don't think it's an income advantage at all, as this Court held in Xilinx. Doing what the government wants to do now and wiping out the arm's-length standard would mean that a related party would not be able to take the same deductions that an unrelated party would. That's the opposite of parity, and that's what the Court concluded in Xilinx. What we have here is an analysis that says you allocate costs under this very statute based on comparability factors in Dash 7F3, using the best method rule, which is a bunch of empirically-based analyses. But now the government is coming in and saying, oh, but we can decide what goes into that cost pool without looking at comparables whatsoever. And they've been very forthright about that in their brief. They say, we don't have to look at comparables. We don't even have to consider transactions in deciding what arm's-length parties would do. But this is nothing like what they said in the preamble. Not only is it — I mean, it's not even remotely preserved under Schenery. But agencies do have the authority to change their interpretation of an ambiguous statute, as long as they do it consistent with their requirements under the APA, right? As long as it's also consistent with the text and purpose of the statute as well. And they can't — they can't go beyond the purpose of the statute, which is what they're doing here. So is it your position that even if we conclude that there was compliance with the APA with respect to this new regulation, which everybody agrees is the regulation itself is unambiguous, right? The new regulation. The regulation, yes. It's an Ipsit-Dixit. It's unambiguous. It states a conclusion. If we concluded that Treasury was due deference for their interpretation of the statute through this regulatory scheme, is it still your position that we would have to conclude that the scheme falls because it's not a reasonable interpretation of the statute? Absolutely, Your Honor. It's not a reasonable interpretation of the statute because the first sentence is still in effect in commensurate with income. Not only is there nothing in the text of the amendment itself, there's nothing in the legislative history. And Treasury rushed into the breach to say they didn't mean to do anything to the arm's-length standard. They said Congress didn't intend any departure from the arm's-length standard at 475 of the white paper. And even now, when they've come up with their new argument, which says, well, we're looking at this legislative history that talks about allocating according to reasonable economic activity, and we don't have to — we can measure reasonable economic activity without looking at all at what people do in the marketplace. Even that contradicts what they said in the piece of the 94 regs that they — the preamble that they cite in their brief, in footnote 11, their reply brief, footnote 11. What they said then was, you know, we don't need a regulation defining what relative economic activity means because, to quote them, because a transaction at arm's-length naturally would reflect the relative economic activity. It's only now that they're coming in and saying, you know what, we can throw it all out the window. The preamble didn't say anything like this. The preamble looks — discusses comparable after comparable and then makes up a comparable from thin air because the real ones weren't helping. It's that they weren't taking that position here. But what is Treasury supposed to do about circumstances and, you know, where there is no comparable? Well, what — one of the ways that the sleight of hand is working here is that there's — comparability isn't a binary inquiry. Comparability in the narrow sense means I can look at this transaction and price. Essentially, it's on all fours, on every level, and it's an arm's-length transaction for the same stuff, the same type of parties, the same contemplation. So whatever the royalty or whatever the other economic terms were there, I can adopt it wholesale. That's the binary sense. And there are very rarely exact comparables, which is why the regs are full of inexact comparables and you have to extrapolate and so forth. But there's also comparability — essentially comparability that goes far enough to resolve certain issues, like this one here. Now, they didn't take issue with the tax court's conclusion. They have not — they didn't take issue in their brief with the tax court's conclusion that the comparables in the administrative record were close enough to decide that no one ever shares stock-based compensation. And they didn't — they haven't taken issue with the preamble that at least did not respond in any meaningful way to the demonstrations by Professors Baumol and Malkiel and Professor Grunfest that no one in their right mind would share stock-based compensation because it's not connected to either the contribution or the results of a joint development project. So where they're coming from now is someplace entirely different from where they were at the time of the preamble, where they said 30 times arm's length, once buried in a paragraph in the middle of the — of the preamble, a paragraph that says arm's length three times, they have one little reference to commensurate with income, which they are now saying, oh, these regs reflect the statutory interpretation that completely eliminates comparability analysis and turns arm's length into a label we can apply to anything we want. There's nothing like that in the preamble. But going back to Chief Judge Thomas's question, I mean, the commensurate income language has to mean something. Of course it does. If it is not at least a permissible way to adjust for those circumstances in which it's difficult to define comparability and to adjust so as to make sure that income, which depends on both cost and the income, that is properly reflected, why wouldn't that be an opportunity to use a different methodology? Well, it's not an opportunity to completely throw out arm's length analysis. And when the statute is there, Congress is understood to understand what it means. And commensurate with income, I mean, the legislative history is quite clear. What you do is you look at the actual income and then you adjust according to what parties that knew something would be so profitable. What would they have done? I mean, the issue that they're talking about, and I think it's pretty clear, and I don't think the government disagrees with this, though they will find out soon enough, is that they were looking at situations where high profit intangibles are being transferred internally and the compensation that's coming back isn't large enough given the profitability. And there's a suspicion that maybe there's a manipulation of ex-ante assumptions when parties are entering into these agreements and you can adjust them by the ex-post reality and say if they had known that, what would have been commensurate with the income actually realized? And so that's, I mean, I think that's not only the Occam's Razor analysis, but it's- From a purely economic analysis standpoint, how do you measure income without knowing what the costs are? Well, you know what the costs are because you measure it the same way you measure everything else under Section 482 by looking at what parties, how parties enter into actual deals, what they count as costs, what arms-length parties count as costs, not what the Treasury decides will be the most amenable to its newest policy. You certainly don't do that when they don't, you know, even hint at that analysis in their preamble. It is, I mean, there's a very well-defined function for commensurate with income. But that doesn't mean they can throw out the whole analysis of what parties do. You can't put things in the cost pool that don't belong there under arms-length analysis simply by saying in this one narrow area, not that the comparables don't work. That's what they said in the tax court. And that's what they said in the preamble. The tax court rejected that. They don't challenge that. Now, for the first time, they're saying, we don't even have to consider comparables. Now, how can that be limited? Perhaps it can be limited to intangibles, but how can it be limited to only one corner of intangibles and a corner of intangible transactions that isn't even properly within the text of the amendment? So you would agree, though, that the last sentence of 482 is not limited to actual transfers, and it could encompass cost-based arrangements with respect to the development of intellectual property. Well, I don't think that's necessarily true. It's not what the text says. I mean, you can't really transfer something that doesn't exist. And as soon as in a cost-sharing agreement, by the time the intangible exists, it's shared. And I think what we have is legislative history saying that nothing in this act, including this provision, is intended to make cost-sharing impossible. We think it should be analyzed consistent with the purposes of the act. Now, if they said with the text of the act, they could have said that, but they didn't say that. This seems to me like typical legislative history and tax legislation that gives additional guidance that isn't actually voted on by anybody and enacted by Congress. Now, it's completely illegitimate. I think it doesn't change the text of the statute. But at any rate, what we have here is the weakest possible application of the statute and the strongest possible rule on the weakest possible administrative record and the strongest possible rule. This is arbitrary decision-making. It's a poster child for arbitrary decision-making. It's exactly why we have a reason decision-making standard. You certainly can't reach this type of conclusion, not even hint at it in the preamble. The preamble says, oh, this complaint wasn't good enough, so we'll make one up. This is what parties generally would do. That's the wording of the preamble. This is what arms-length parties generally would do. They would generally share a stock-based compensation. There is no evidence that unrelated parties ever share a stock-based compensation in any kind of joint arrangement, whether it's a high-profit intangible like the Amelin Agreement or something, oil equipment or anything else. So how can you make a rule that says parties generally do something when they don't do it at all and then come back and say, you know what, we were just kidding. All that preamble, that's extraneous language. The piece that really supports these rules is our reference to the words commensurate with income. We didn't explain them, but we referred to them. And that means that we can throw out the arms-length standard. It's not what they said in the white paper. It's not what they said in their other regulations. It's not what they said until they got into litigation. They said something fairly similar in the Zionist case, but that was well after the promulgation of this rule. This is administrative decision-making at its worst. They're saying that now in connection with the promulgation of this rule, are they not? They're saying it, yeah, that 14 years after the rule it was promulgated. Yeah, they're saying it. And they said they began to develop this argument in the tax court. They didn't quite have it quite as blatantly as they presented it now. They were, in the tax court, they were somewhat more tied to what they'd actually done in the preamble. But now they're taking this broad brush approach, which essentially says, based on a statute whose application to cost-sharing is questionable at best and then certainly doesn't seem to be strictly covered as a transfer, doesn't seem to be covered at all as a transfer. But they're saying, based on that, we can just throw out the first sentence. Now, if there's ever a case, I mean, if they had articulated this, it would be a weak case. But they didn't articulate it. They didn't articulate this in the preamble whatsoever. It can't even, shouldn't even be considered by this court. This is, I mean, this is just, this is agency overreaching at its worst. And it's, and Mr. Catterall acknowledged that, you know, the treaties, the treaties, which were very important to this court in the Seimlich's case, they deal with the arm's-length standard as an empirical, as an empirical analysis. It has to be an empirical analysis. The commensurate with income standard, the regs that actually deal with that, the ones that say they deal with commensurate with income, in the Dash 7, the Dash 4 regs, they say that they take into account various, various empirical factors. And in fact, despite what they said and what the government said in its brief, the regs that specifically deal with commensurate with income explicitly give an exception if you can come up with a good enough comparable in Dash 4, F2, Little-Robin 2. And so there's at least some recognition that the arm's-length standard still applies even in the heartland of commensurate with income. And the notion that they can come here now with something that doesn't really even fit under the statute based on an administrative decision that didn't even, you know, hint at this broad statutory interpretation is ludicrous. And it can't be squared with Congress's decision to leave in place that, leave in place that first sentence and add commensurate with income, not as a, you know, not as eliminating the arm's-length standard for those transactions. If it had done that, you surely would have thought someone would have noticed and you wouldn't have had everyone from the secretary to the commissioner to one of the authors of one of the AMCAS briefs here going out and saying, oh, nope, it's still the arm's-length standard still applies. This is a new tool. We do things a little differently with intangibles, but the arm's-length standard still applies. You have to take comparables as far as they will go. And if they go far enough- And if they don't go anywhere, as everyone seems to say in this case? Oh, no one, I don't think anyone, we certainly don't say that. They go far enough to tell you that no one shares stock-based compensation ever. So that can't be thrown into the constable. I think that's a, they can do it, they can look at what arm's-length parties would do in an arrangement that correctly anticipated how profitable, how much income would be derived. But they can't just sort of make up the elements as if arm's-length practice simply didn't exist. I mean, that is not anything that is, that if that was what was intended, if that was what was intended, you would have thought there would have been something erasing the first sentence. There's nothing that erases the first sentence. And you would have thought, frankly, that they would have hinted at this purely internal analysis in the preamble. It's not there at all for the reason it's a contradiction in terms. You can't have a purely internal analysis that is consistent with arm's-length practice and arm's-length analysis. You can't have something that doesn't even look at reality to ultimately impose parity between controlled and uncontrolled parties, which the Supreme Court thinks is the purpose of the statute. Treasury thinks it's the purpose of the statute. They haven't taken that regulation off the table. All we know, we had the last time in Xilinx, there was a conflict between regulations, but now we know that that principle is in the statute and the regulation can't trump the statute and it can't trump the statute even if there's a tool given by another sentence of the statute to help refine arm's-length analysis in certain situations where it is believed that the, essentially, parties were not reaching arm's-length results because they were using inferior comparables. One of my problems with the way the tax court decision is written, with the way all of this has been argued, is that it's written as if this were an APA challenge to the passage or failure to pass a regulation, rather than with a recognition that the ultimate inquiry at the end of the day is what is a reasonable interpretation of the statutory authority to act given to Treasury. Well, I don't think that's correct, Your Honor. The IRS and Treasury are subject to the APA and all the requirements. Now, there's no... It has certainly been the Treasury's... And the way that comes into play under Chevron is that in order to get deference, the regulation as for which Treasury seeks deference has to have been passed in a way that's APA compliant, it has to be within the scope of Treasury's authority, and it has to be not an unreasonable interpretation of the statute. So you go through each of those steps. But at the end of the day, the resolution is that because it's not a reasonable interpretation of the statute, either with deference or without deference, you can't apply that regulation to these particular parties. It doesn't invalidate the regulation as a whole. Obviously, it's a decision that would control with respect to other parties until something was tweaked, but it's not an APA challenge. Well, I... Otherwise, it wouldn't be in the tax court. Your Honor, there's nowhere else for it to go besides a tax court or a refund suit. There's no... The steady and consistent position of the agency and the practice of parties for lo these many years has been that any attempt to make a direct challenge to a Treasury regulation is barred by the Anti-Injunction Act. D.C. Circuit just decided a case, the Mays case this summer that agreed with Treasury on that ground. The only place you can raise an APA challenge is... Right, but it's got to be in the context of Chevron, correct? Well, Chevron's the last step. If there's no reasoned decision-making, you don't even get to Chevron. I mean, that's what Encino-Motorcar says, and we don't have reasoned decision-making here. We don't have... The argument they're making in this court, you know, wasn't raised at all and shouldn't be considered. It should be... The case should be evaluated the way it was presented to the tax court because they've come up with something entirely new, even if that new interpretation that wipes away the arm's length standard, wipes away comparables altogether, wipes away arm's length analysis, takes arm's length out of the arm's length standard, even if that could have been before the court, it certainly wasn't explained in the preamble to this regulation. It's nowhere there. It can't be found. You can find arm's length all over the place, but what you can't find is anything that explains that arm's length is really gone. It just says, this is arm's length. It's arm's length because we made up a comparable. We don't like the comparables that are out there in the real world, even though they're 100% consistent. The tax court disagreed with that. They don't take issue with that conclusion. So they don't... You don't even get to Chevron on this. Is it possible you could get to Chevron with a similar rule? Yeah, they could possibly promulgate a rule that actually said what they are doing, said what their rationale was, and, you know, it might or might not be where it couldn't be on this record, but on some other record, it might be consistent with both sentences of the statute. They don't get to pick and choose between sentences of the statute any more than they get to pick and choose in adjusting related party transactions. They can't say, well, we're going to go with the unrelated party structure and make these adjustments based on unrelated party behavior, and we're also going to theorize about something that related parties would do. I mean, you start with the actual related party transaction. You just, to bring it into parity, you don't just kind of pick and choose elements however you would like to make the biggest revenue impact. That's completely impermissible, and it makes no sense. No more sense than this purely internal analysis. Purely internal arm's length analysis is a contradiction in terms, which is why they're trying to wipe the first sentence out of the statute. Well, I think I'll leave it at that, Your Honor. I mean, this is an interpretation that essentially takes one piece of the statute out of the calculus on an explanation that doesn't exist, and at best is hinted at in some kind of secret code where you're supposed to take these three words, commensurate with income, disregard everything the agency ever said about it, including now, where they say it's consistent with the arm's length standard and find that it's reasonable because arm's length standard doesn't have to include anything. The arm's length standard can be satisfied without any reference, not perfect reference. Nobody thinks it's perfect reference, but without any reference to the actual behavior of arm's length parties. This is inconsistent with the statute and it doesn't stand on its face, which is probably why they didn't surface it in the preamble at all. Thank you, counsel. We do have a little bit of practical application or guidance as to the practical application of the commensurate with income requirement. The 1986 House report indicated that the commensurate with income requirement would require periodic adjustments to royalty payments to reflect actual profit experience. And nothing in the report suggests that this periodic adjustment requirement could be overridden by evidence that agreements between unrelated parties do not provide for such ongoing adjustments. And commentators have noted that agreements between unrelated parties normally do not provide for these periodic adjustments. Yet we know that two years after the 1986 Act, Congress legislatively confirmed its understanding that the commensurate with income requirement is entirely consistent with the arm's length standard that is incorporated into all of our tax treaties. So, and again, Judge O'Malley mentioned that the commensurate with income requirement has to mean something. And it necessarily entails an internal analysis. It looks at the two sides of the related party transaction. And to say that, you know, that that just doesn't mean anything in terms of what the arm's length standard means, I think you're just, you're just sort of rationalizing away the language of the statute. And as far as, I mentioned earlier that, that the cost-sharing arrangements between unrelated parties are inherently not comparable to cost-sharing arrangements between related parties. And, and the reason that is, is in the context, when unrelated parties enter into a cost-sharing arrangement, you have mutuality of risk that is not present in the related party context. And what I mean by that is that each of the unrelated parties may decide that bearing 100% of the cost of its own development-related stock-based compensation cost is preferable to sharing such costs and being exposed to the risk of the other party's stock price going through the roof. So, you know, it may just be sort of a wash in economic terms. And, you know, let's just leave it off the table. And that's, you know, that's sort of a tit for tat. You don't have that in the related party context, where the domestic parent knows full well that its Cayman subsidiary will never incur stock-based compensation costs. There is no mutuality of risk. So there's, there is no economic reason whatsoever for the domestic parent not to require its offshore subsidiary to share the parent's stock-based compensation costs. And I think in the Xilinx opinion, and we cite this on page 70 of our opening brief, Judge Fischer talked at length about why these arrangements between unrelated parties are inherently not comparable. Two arrangements between related parties. And, you know, he basically said what I just said. And as far as, you know, this notion that that the Treasury is getting rid of the arm's length standard altogether is a bit of hyperbole. And I think, I mean, the notion, again, there is a conflation of the arm's length standard and comparability analysis. They're not the same thing. And I think in this court's Xilinx opinion, this court thought or felt that the arm's length standard had a plain meaning and it went with that analysis. But in the withdrawn opinion, Judge Fischer dropped a footnote that recognized that Congress and regulators may adopt a technical definition of a term that is distinct from its plain meaning. And I think the recognition there is that the arm's length standard, there's not a plain meaning. It's a term of art. And we would submit that, again, Treasury as the agency that has been entrusted to administer this statute, Treasury's interpretation is entitled to deference of what the arm's length standard means. Thank you, counsel. The case is argued to be submitted for decision and will be in recess for the afternoon.
judges: Reinhardt, Thomas, O'Malley